In the Matter of UNECO, INC.,
Bankrupt.

UNITED STATES of America, Appellant,

v.

UNECO, INC., Appellee.

No. 75–1201.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 16, 1975.

Decided March 31, 1976.

Rehearing and Rehearing En Banc
Denied April 21, 1976.

taxes against the bankrupt, Uneco, Inc., in the amount of $191,745.08. The basis of the government's claim was the disallowance of certain bad debt deductions for 1968, 1969, and 1970 which produced an income tax deficiency for 1969. The Internal Revenue Service claimed that certain advances made by Uneco to three affiliated corporations constituted contributions to capital and were not loans, and therefore that Uneco could not properly take bad debt deductions pursuant to Section 166 of the Internal Revenue Code of 1954.[1] Upon review, the District Court reversed the order of the referee, and from that judgment the government appeals.

The parties do not dispute the factual background of the case, but rather disagree upon the weight to be accorded the subjective intent of Uneco in making the advances to its affiliated corporations. The referee ruled that objective criteria were to be considered and were decisive despite the parties' intent; the District Court held that Uneco's subjective intent alone controlled the issue of whether the advances were loans or capital contributions. A proper resolution of the dispute thus requires an examination of the particular facts and a determination of which legal standard must be applied.

The undisputed facts are as follows:

In 1968, Uneco was a successful business whose primary function was the fabrication and manufacture of metal products. Its secondary function was the assembly-line joinder of small components into finished products. Uneco's business was based mainly on contracts with the Department of Defense. In that year, Uneco's management realized that the government contracts would soon terminate and that the company's vitality could be maintained only through diversification. Three separate affiliated corporations were thereafter formed or acquired to implement this policy. Uneco then made advances to these corporations and, when the corporations failed fully to repay the advances, made a

Carolyn Just, Atty., Tax Div., Dept. of Justice, Washington, D. C., for appellant; Daniel E. Wherry, U. S. Atty., Paul Wayne Madgett, Asst. U. S. Atty., Omaha, Neb., Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews and Leonard J. Henzke, Jr., Attys., Washington, D. C., on brief.

Donald J. Buresh, Omaha, Neb., for appellee; Thomas D. Stalnaker, Omaha, Neb., on brief.

Before HEANEY, BRIGHT and WEBSTER, Circuit Judges.

WEBSTER, Circuit Judge.

In the bankruptcy proceeding below, the referee allowed a federal claim for income

1. 26 U.S.C. § 166.

claim for bad debt deductions through additions to its bad debt reserve. It is those deductions which IRS disallowed on the ground that the advances were contributions to capital.

## Great Plains

Great Plains Smelting and Refining Company was established as an operation for the development and use of a new scrap metal processing procedure in 1968. Great Plains was organized by three officers and major stockholders of Uneco and by a fourth person who owned the rights to a necessary patent and the land where the company was located. Each of the officers contributed $6,000 in cash while the fourth person contributed the patent rights and the land in lieu of $6,000. The total capitalization was thus $24,000. Great Plains was incorporated as a separate entity rather than as a part of Uneco in order to enable it to secure a Small Business Administration loan.

As one of the country's largest producers of brass scrap metal, Uneco had a sizeable brass inventory which it sold to Great Plains. In addition, Uneco made various cash advances to Great Plains. The total amount of the sales and advances from 1968 to 1970 was $193,090.11, of which amount $40,000 was repaid. The advances were carried as accounts receivable by Uneco and there was no other independent evidence of indebtedness. Uneco, at the insistence of its accountants, assigned $69,369.00 of the accounts receivable for these sales as reserved bad debts in 1969. Great Plains subsequently was forced to secure a bank loan, but the bank loaned the money only upon the condition that repayment to Uneco be deferred until the bank loan was fully paid. Uneco acquiesced in this subordination.

## Boji

Boji Electronics, Inc., a family-owned corporation located in McGregor, Iowa, had valuable contracts for the production of sound speakers. It had, however, suffered severe losses in two floods and a fire and was looking for a new location and a way to re-establish its business. Uneco's president made arrangements with the Boji family for Uneco to purchase 51 percent of the Boji stock and to move the company to the Uneco facilities in Nebraska. From 1968 to 1970, Uneco made advances to Boji for rent, utilities, labor, materials, and other financing. In addition, Uneco guaranteed and repaid part of Boji's Small Business Administration loan. The advances, totalling $285,862.53, were shown on Uneco's books as accounts receivable. Boji repaid $26,869.65 of this amount, but Uneco increased its bad debt reserve by $227,571.00 on account of advances made to Boji.

## Unipac

Unipac, Inc. was incorporated in July, 1968, with a total capitalization of $4,000.00 by three major stockholders of Uneco and two Uneco employees. Unipac was formed in response to the representations of certain individuals that they had a market for molded plastic products, primarily hospital "check-in" kits consisting of various items needed by persons entering hospitals. Because of its expertise in tooling and metal molding procedures, Uneco determined that the molding of plastic products would be compatible with Uneco's other operations. Unipac was separately incorporated, in part, to avoid taking Uneco outside SBA's definition of a small business for purposes of Uneco's contemplated application for a loan. Uneco made advances totalling $207,667.55 to Unipac from 1968 to 1970, of which amount $120,728.52 was repaid. Again, these advances were carried on Uneco's books as accounts receivable.

On its corporate income tax returns, Uneco took bad debt deductions, through additions to its reserve for bad debts, for the outstanding advances it had made to the three affiliates. In January, 1971, Uneco was obliged to file for bankruptcy proceedings, and the Internal Revenue Service subsequently filed a proof of claim against the bankrupt estate for income taxes, claiming that the deductions should not have been allowed since the advances were contribu-

tions to capital and not loans. The trustee in bankruptcy objected to the claim, but after hearing evidence, the referee allowed the claim.

The referee specifically found that the actual intent of the parties was to create debtor-creditor relationships, that the parties were not principally motivated by tax avoidance purposes, and that the transactions between Uneco and its affiliates were not contrived as shams or masquerades. The referee concluded, however, that the facts when objectively viewed indicated that the transactions were contributions to capital rather than debts. The referee relied in part upon the high debt-equity ratios and the fact that an outside lender would not have given the affiliates credit in the manner in which Uneco granted credit to them.[2] The District Court reversed the referee's order, holding that the subjective intention of the parties to create a debtor-creditor relationship controlled regardless of the economic realities. The District Court held that this result was mandated by *J. S. Biritz Construction Co. v. Commissioner of Internal Revenue,* 387 F.2d 451 (8th Cir. 1967). We disagree and reverse the judgment of the District Court.

I

■ The bad debt losses claimed by Uneco are allowable in this case only if the unrepaid advances to its affiliates are shown to be bona fide loans. Gifts or contributions to capital are by regulation excluded from bad debt deductions.[3] This much is not disputed. The litigants part company in this case upon the weight to be accorded the customary tests employed in determining the true nature of an unrepaid advance for tax purposes.

■ In opposing the government's claim, the burden was upon the trustee to demonstrate that the advances were bona fide loans and not contributions to capital. *See J. S. Biritz Construction Co. v. Commissioner of Internal Revenue, supra,* 387 F.2d at 455; *Smith v. Commissioner of Internal Revenue,* 370 F.2d 178, 180 (6th Cir. 1966); *Wood Preserving Corp. of Baltimore v. United States,* 347 F.2d 117, 118 (4th Cir. 1965). Advances between a parent corporation and a subsidiary or other affiliate are subject to particular scrutiny "because the control element suggests the opportunity to contrive a fictional debt". *Cuyuna Realty Co. v. United States,* 382 F.2d 298, 300–01, 180 Ct.Cl. 879 (1967). *Cf. Road Materials, Inc. v. Commissioner of Internal Revenue,* 407 F.2d 1121, 1124 (4th Cir. 1969).

In *J. S. Biritz Construction Co. v. Commissioner of Internal Revenue, supra,* 387 F.2d at 456–57, we recognized that each case turns upon its particular facts and that the varying indicia applied in determining the issue may or may not have relevancy to a particular case. Ten different indicia

2. The referee stated:

> *Objectively* the transactions between Uneco, Great Plains, Boji, and Unipac give rise to capital contributions. Apart from testimony of actual intention and motive, I think the facts I have previously found establish that the transactions placed "credit" at the risk of the three affiliated corporations and hence the "credit" was truly risk capital; that all three of the corporations were vastly under-capitalized with astronomical ratios of debt to equity; that no outsider would have dared advance to the three affiliated corporations anything near the "credit" Uneco advanced; that Uneco advanced the "credit" without regard to the safeguards most creditors would have required; that Uneco could not reasonably expect repayment unless the affiliated corporations were successful in their business ventures; and that

overall, viewing the transactions from beginning to end in the light of the factors which most courts have said should be considered, the extensive credit Uneco advanced to the three affiliated corporations, which had virtually no assets and no prospects other than the success of their business activities, cannot be reconciled with the concept of a "loan." (emphasis original)

3. Treas.Reg. § 1.166–1 provides:

> (c) *Bona fide debt required.* Only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. A gift or contribution to capital shall not be considered a debt for purposes of section 166. * * *

were identified in *Biritz* and may be summarized as follows:

(1) Whether the corporation was so grossly undercapitalized that the loans were in fact needed for capital purposes and were actually intended to be risked capital rather than a loan.

(2) Whether the purported loans were made in proportion to equity holdings.

(3) Whether the repayment of the loan was predicated on the success of the venture.

(4) Whether there was a fixed date for payment of the note and a reasonable expectation of payment by that date.

(5) Whether the note was subordinated to other corporate debts.

(6) Whether third parties would have made the loan under the same conditions.

(7) Whether the claimed loan was secured by a mortgage or otherwise.

(8) Whether a provision was made for a sinking fund to retire the loan.

(9) Whether the person making the purported loan participated in the management of the corporation.

(10) Whether the corporation had a large proportion of debt to equity.

387 F.2d at 457. More recently the Fifth Circuit has identified the following relevant factors:

(1) the names given to the certificates evidencing the indebtedness;

(2) the presence or absence of a maturity date;

(3) the source of the payments;

(4) the right to enforce the payment of principal and interest;

(5) participation in management;

(6) a status equal to or inferior to that of regular corporate creditors;

(7) the intent of the parties;

(8) "thin" or adequate capitalization;

(9) identity of interest between creditor and stockholder;

(10) payment of interest only out of "dividend" money;

(11) the ability of the corporation to obtain loans from outside lending institutions;

(12) the extent to which the initial advances were used to acquire capital assets; and

(13) the failure of the debtor to pay on the due date or to seek a postponement.

*In re Indian Lake Estates, Inc.,* 448 F.2d 574, 578–79 (5th Cir. 1971). *See also A. R. Lantz Co. v. United States,* 424 F.2d 1330, 1333 (9th Cir. 1970). *See generally* R. Murray, *Debt v. Equity: Current Criteria for Distinguishing,* 4 Creighton L.Rev. 5 (1970).

The indicia supplied by *Biritz* are objective tests which, with the possible exception of the first indicia, require no reference to a subjective state of mind. The relevant factors identified in *Indian Lake Estates* are essentially objective factors with the exception of the seventh factor. The District Court, however, placed special reliance upon the following statements in *Biritz*:

Although there is no one controlling factor or broad rule that can be used in deciding these cases, the courts have usually recognized advances or loans to a closely held corporation as creating a true debtor-creditor relationship where there is a demonstrable business purpose in making a loan and the transaction is not a tax-avoidance scheme or a sham or masquerade. * * *

* * * * * *

There is actually no evidence that this was not a loan, was not intended to be a loan, or that Biritz actually intended to make a capital investment rather than a loan.

* * * We feel the controlling principle should be that any transaction which is intrinsically clear upon its face should be accorded its legal due unless the transaction is a mere sham or subterfuge set up solely or principally for tax-avoidance purposes.

387 F.2d at 458–59. From these statements, the District Court concluded that subjective determinations of good faith would control the outcome of any analysis under what it perceived to be the rule in

the Eighth Circuit.[4] We think the District Court misapplied the language of *Biritz*, which is not inconsistent with the holdings in other circuits.

In *Biritz*, a taxpayer had incorporated his home construction and repair business in order to limit his personal liability. The taxpayer was, for all practical purposes, the sole shareholder of the corporation. He transferred a tract of land to the corporation and received an unsecured demand promissory note as partial payment. The taxpayer then demanded and received payment of the note. The Tax Court held that the payment of the note constituted a dividend since the transfer of the land was in fact a contribution to capital and not a loan. Upon review, we reversed the decision of the Tax Court. The basis of reversal was not solely the good faith intention of the parties to create a debtor-creditor relationship, as the District Court here found. Rather, the opinion reflected an analysis of the actual transaction and employed the subjective intent factor to test the transaction which we found to be "intrinsically clear upon its face" for evidence of sham or subterfuge. We noted that the debt to equity ratio of two-to-one was "patently not so inordinately high as to qualify this as 'thin capitalization' case." 387 F.2d at 459. We observed that the note was in legally proper form, that it was not subordinated, and that interest on it was paid annually. We also considered other factors, such as the lack of a mortgage for security and the demand nature of the note, which arguably would support an inference of capital contribution, and found them not to be control-

ling. More important was the fact that a "reasonable and fixed rate of interest was paid and the corporate earnings were not siphoned off by this transaction." 387 F.2d at 459.

In the recent case of *Astleford v. Commissioner*, 33 T.C.M. 74–184, ¶ 74,184 P–H Memo TC (1974), aff'd, 516 F.2d 1394 (8th Cir. 1975), the Tax Court considered a similar question in light of sixteen separate factors, including the intent of the parties, which it equated in part to the nature of the instruments employed to evidence the debt. It further noted that "[t]here is no single characteristic which is decisive in the determination of whether a debt exists or a risk investment has been made by the shareholder." ¶ 74,184 P–H Memo TC at 74–741. We affirmed the holding of the Tax Court that the advances were equity rather than loans, noting that the equity was so thin compared to the degree of debt capitalization as to be almost meaningless and that the conceded capital was minimal in relation to day-to-day cash requirements. We affirmed on the basis of these reasons "and the other reasons discussed by the Tax Court". 516 F.2d at 1395. It is interesting to note that we so held despite formal papers which gave the appearance of a loan.

Since objective factors are to be considered and given weight under the particular circumstances of the case, along with evidence of the intent of the parties, it follows that the District Court applied an erroneous standard by assuming that subjective intent would alone control the determination of the nature of the advances for tax purposes.[5]

4. The District Court held:
On the basis of * * * *Biritz*, we agree with the trustee and conclude that the order of the referee must be reversed. It is clear that the Referee found (and his findings of fact are not challenged in this appeal) that demonstrable business purposes of Uneco were served by the loans and that there were no shams, masquerades or tax avoidance motives involved. Rather, the intention was to create a true debtor-creditor relationship.
The United States argues that *Biritz* should not be followed because the majority of the Courts of Appeals emphasize objective factors and the search for the true economic reality of

the transactions, rather than the subjective search for the intentions of the parties.
Whatever may be the rule in other Circuits, *Biritz* clearly emphasizes the importance given by our Court of Appeals to the good faith intention and business purpose of the parties, and it is the duty of this Court to apply the holding of that decision. (footnotes omitted)

5. Section 385 of the Internal Revenue Code, 26 U.S.C. § 385, supports our conclusion that objective factors should be given consideration in the decision on this issue. That section provides:

## II

We turn now to an examination of the factors in addition to intent which were considered by the referee in arriving at his determination. There was almost complete identity of interest between the parties. There was no written, unconditional promise to pay on demand or on a specified date a sum certain at a fixed rate of interest, a factual distinction from *Biritz* and one which suggests the absence of intent to create a debt. *See Astleford v. Commissioner, supra.* Uneco subordinated its interests either directly or by guaranteeing loans of two of its affiliates. The three affiliates were undercapitalized. No suits were filed to recover the advances. The referee found that no outside lender would have made the loans on the same conditions, noting that Uneco did not require any security or other safeguards for repayment of the loan. Each affiliate had a high debt-to-equity ratio. We note, moreover, that each of the affiliates had entered upon a business unrelated to the business of Uneco, which adds further support to the conclusion that advances made to these affiliates were investments rather than loans, since return on investment appeared to be the objective. *See Tyler v. Tomlinson,* 414 F.2d 844, 849 (5th Cir. 1969).

We cannot say that the findings of the referee were clearly erroneous[6] or that the referee gave undue weight to any of the factors which he properly considered; the judgment of the District Court must accordingly be set aside.

Our holding does not imply the end of stockholder loans to one-man corporations, nor does it represent a departure from our holding in *Biritz* that "any transaction which is intrinsically clear upon its face should be accorded its legal due unless the transaction is a mere sham or subterfuge set up solely or principally for tax-avoidance purposes." 387 F.2d at 459. The record in this case is one in which the transaction, tested against the objective factors enumerated with proper consideration given to the evidence of the intent of the parties, simply fails to demonstrate, within the framework of the trustee's burden, that the transactions were bona fide loans rather than contributions to capital. The conclusions of the referee are supported by the evidence and are not clearly erroneous.

The order of the District Court is reversed and the case is remanded with instructions to enter a judgment affirming the order of the referee.

§ 385. *Treatment of certain interests in corporations as stock or indebtedness*

(a) *Authority to prescribe regulations.*—The Secretary or his delegate is authorized to prescribe such regulations as may be necessary or appropriate to determine whether an interest in a corporation is to be treated for purposes of this title as stock or indebtedness.

(b) *Factors.*—The regulations prescribed under this section shall set forth factors which are to be taken into account in determining with respect to a particular factual situation whether a debtor-creditor relationship exists or a corporation-shareholder relationship exists. The factors so set forth in the regulations may include among other factors:

(1) whether there is a written unconditional promise to pay on demand or on a specified date a sum certain in money in return for an adequate consideration in money or money's worth, and to pay a fixed rate of interest,

(2) whether there is subordination to or preference over any indebtedness of the corporation,

(3) the ratio of debt to equity of the corporation,

(4) whether there is convertibility into the stock of the corporation, and

(5) the relationship between holdings of stock in the corporation and holdings of the interest in question.

To date, the Secretary has not promulgated any regulations pursuant to this section. The importance of this section is not so much that it identifies relevant factors but that it indicates a congressional desire to have the debt-equity issue resolved by examination of objective criteria.

6. *See Shainman v. Shear's of Affton, Inc.,* 387 F.2d 33, 37 (8th Cir. 1967). *Cf. A. R. Lantz Co. v. United States,* 424 F.2d 1330, 1334 (9th Cir. 1970); *Charter Wire, Inc. v. United States,* 309 F.2d 878, 880 (7th Cir. 1962).