T.C. Memo. 2012-215

UNITED STATES TAX COURT

HARRY ROBERT HAURY, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17584-10.                    Filed July 30, 2012.

Harry Robert Haury, pro se.

Catherine S. Tyson, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

FOLEY, Judge:  After concessions, the issues for decision, relating to

petitioner's 2007 Federal income tax return, are whether petitioner is entitled to a

bad debt deduction; must include in gross income distributions from his individual

retirement account (IRA); is liable for a section 72(t)(1)[1] additional tax; and is liable for section 6651(a)(1) and section 6654 additions to tax.

## FINDINGS OF FACT

Petitioner is a software engineer. He developed software and licensed it to NuParadigm Government Systems, Inc. (NPGS), and NPS Systems, Inc. (NPS), two information systems companies to which he provided technical advice and strategic direction. NPGS and NPS provided services to government clients and corporate clients. During the year in issue, petitioner, age 51, was the chief executive officer and owned 48.3% of NPGS. In addition, petitioner owned 49.2% of NPS and was president, secretary, and sole member of its board of directors. NPGS and NPS had paid-in capital of $853,528 and $8,405,043 respectively. NPGS had more than 20 employees, who collectively received annual salaries in excess of $1.5 million. In 2005 and 2006 NPS paid petitioner $147,612 of compensation and NPGS paid petitioner no compensation. Petitioner, on his 2006 Federal income tax return, reported adjusted gross income of $271,028 and a tax liability of $58,493.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

In late 2006 the U.S. Department of Homeland Security (DHS) entered into a contract (DHS contract) with Sandia Corp. (Sandia)[2] to assist with the development of national alert warning system software.[3] The DHS contract provided that Sandia could not begin any task before receiving authorization from DHS. In 2007 Sandia entered into a subcontract (Sandia subcontract) with NPGS to assist with the DHS contract.[4] The Sandia subcontract provided that NPGS could not begin any task before receiving authorization from Sandia.

To prepare for a demonstration to DHS, NPGS and NPS (collectively, companies) incurred approximately $4 million of development costs. In 2007, to ameliorate cashflow problems, petitioner transferred $434,933[5] to the companies from his IRA (i.e., $120,000, $168,000, $100,000, and $46,933 on February 15, April 9, May 14, and July 6, respectively).[6] In addition, petitioner executed interest-bearing promissory notes relating to the $168,000, $100,000, and $46,933 transfers.

---

[2]Sandia was a federally funded research and development center operated by the U.S. Department of Energy.

[3]NPGS was also a party to this contract.

[4]NPS was a subcontractor to NPGS.

[5]In 2007 petitioner withdrew a total of $434,964 from his IRA.

[6]Petitioner previously transferred $107,506 to NPS on June 6, 2006, which was documented by an interest-bearing promissory note.

Pursuant to the notes, the companies were required to repay petitioner upon demand. On April 30, 2007, the IRA trustee received and deposited into petitioner's account a $120,000 NPGS check dated and mailed on April 16, 2007. Petitioner solicited Tim Swank, a private investor, for additional funds. Mr. Swank required, and petitioner agreed, to subordinate his repayment rights. Thereafter, Mr. Swank lent $500,000 to NPGS (Swank loan). The Swank loan was documented by an interest-bearing promissory note dated October 5, 2007. This note provided for monthly interest payments and was payable in full upon demand. NPGS, on its Federal income tax return relating to the taxable year ending October 31, 2007, reported $814,933[7] of long-term notes payable.

In December 2007, Sandia, upon receiving notification that DHS would not authorize additional work, instructed NPGS to cease operations. In response, on December 13, 2007, petitioner by email demanded that the companies repay the funds transferred from his IRA. Mike Pourney, the president of NPGS and authorized representative of NPS, refused petitioner's demand and insisted that the companies could not repay. At the time of petitioner's demand, NPGS anticipated

---

[7]This amount included the $168,000 note from petitioner to NPS, the $100,000 and $46,933 notes from petitioner to NPGS, and the $500,000 Swank loan.

receipt of $180,000 for tasks that had been authorized and performed. NPGS also anticipated receipt of approximately $200,000 from an unrelated contract.

The companies' financial statements for the year ending December 31, 2007, delineated only one note payable (i.e., the Swank loan). After 2007 petitioner and Mr. Swank met regularly to review the financial records and discuss the status of NPGS. During this time petitioner received no salary from the companies and NPGS repaid $40,000 to Mr. Swank.

In February 2010 respondent prepared a substitute for return (SFR) relating to petitioner's 2007 tax year and on May 10, 2010, sent petitioner a statutory notice of deficiency. Respondent determined that petitioner had a tax liability relating to: wage income of $149,216; a $434,964 early withdrawal from an IRA; and his failure to file a tax return, timely pay tax, and pay estimated income tax. On August 5, 2010, petitioner, while residing in St. Louis, Missouri, filed his petition with the Court.

In August 2010, after filing his petition, petitioner filed his Federal income tax return relating to 2007. On his return, which included a Schedule C, Profit or Loss From Business, petitioner reported a bad debt deduction of $413,156, wage income of $149,217, a retirement distribution of $434,964, and a 10% additional tax of $31,996.

## OPINION

Amounts distributed from an IRA are includible in gross income unless an exception applies. Sec. 408(d)(1). Petitioner readily acknowledges distributions totaling $434,964 but contends that the $120,000 deposited into his IRA on April 30, 2007, is a rollover contribution and not includible in his gross income.[8] See sec. 408(d)(3). We disagree. The $120,000 distribution was paid into the IRA more than 60 days after the date of the distribution and thus did not qualify as a rollover contribution. See id. Accordingly, $434,964 is includible in petitioner's gross income. See sec. 408(d)(1). In addition, during 2007 petitioner was less than 59½ years of age. Thus, pursuant to section 72(t)(1), he is liable for a 10% additional tax with respect to the distributions. See sec. 72(t)(1) and (2). The distributions do not meet any of the exceptions set forth in section 72(t)(2).

We must also determine whether the $413,156 claimed on Schedule C is deductible as a bad debt related to petitioner's trade or business. Nonbusiness bad debts are not deductible and are treated as short-term capital losses. Sec.

---

[8]Pursuant to sec. 7491(a), petitioner has the burden of proof unless he introduces credible evidence relating to the issue that would shift the burden to respondent. See Rule 142(a). Our conclusions, however, are based on a preponderance of the evidence, and thus the allocation of the burden of proof is immaterial. See Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 210 n.16 (1998).

166(d)(1)(B).  Bona fide business bad debts, however, may be deducted during the taxable year in which they become worthless.  Sec. 166(a)(1), (d)(1).  These debts must arise from debtor-creditor relationships that are based upon valid and enforceable obligations to pay fixed or determinable amounts of money.  Sec. 1.166-1(c), Income Tax Regs.  A gift or contribution to capital is not considered a debt.  United States v. Uneco, Inc. (In re Uneco, Inc.), 532 F.2d 1204, 1207 (8th Cir. 1976); sec. 1.166-1(c), Income Tax Regs.  To determine whether a bona fide debt exists, we consider objective and subjective factors.  In re Uneco, Inc., 532 F.2d at 1209.

Petitioner's transfers from his IRA to the companies were bona fide loans arising from a debtor-creditor relationship.  Each transfer was structured as, and intended to be, a loan.  See sec. 1.166-1(c), Income Tax Regs.  The transfers were documented by valid enforceable interest-bearing notes, and petitioner expected and demanded repayment.  Furthermore, NPGS and petitioner consistently treated the transfers as loans on NPGS's Federal income tax returns.

We must next determine whether and when the aforementioned loans became worthless.  See sec. 166(a)(1).  In December 2007, after Sandia instructed NPGS not to perform any additional work, the companies' projected future profits were less than the amount owed to Mr. Swank.  See sec. 1.166-2(a), Income Tax Regs.

Furthermore, petitioner credibly testified that neither liquidation of the company nor legal action would result in repayment. See sec. 1.166-2(b), Income Tax Regs. Petitioner's loans were subordinated to the Swank loan, and therefore repayment of petitioner's loans was not possible. See id. Thus, the loans became worthless during 2007.

Petitioner's investment in and management of the companies do not amount to a trade or business. See sec. 166(d); Whipple v. Commissioner, 373 U.S. 193, 200, 202 (1963) (holding that investing one's money and managing one's investments do not amount to a trade or business). Moreover, the dominant motivation for making the loans was not petitioner's trade or business as an employee of the companies. See United States v. Generes, 405 U.S. 93, 103 (1972) (holding that a taxpayer's trade or business must be the "dominant motivation" for a loan); Dagres v. Commissioner, 136 T.C. 263, 282 (2011) (holding that a loss is a nonbusiness bad debt where a taxpayer's dominant motive is to protect his investment in a corporation, even if the taxpayer is an employee). Petitioner designed the software used by the companies and invested a significant amount of time and money to ensure the success of the companies. Protection of petitioner's investment interests in the companies, rather than protection of his salary, was the dominant motivation for the loans. See id. We note that petitioner worked for the

companies without compensation after 2007. Accordingly, petitioner's loans to the companies were nonbusiness debt.

Respondent also determined that petitioner is liable for a section 6651(a)(1) addition to tax for failure to file a timely return. Respondent established that petitioner failed to timely file his return. See sec. 7491(c). Petitioner filed his Federal income tax return in August 2010 and has failed to establish, pursuant to section 6651(a)(1), that the untimely filing was due to reasonable cause and not willful neglect. Accordingly, petitioner is liable for a section 6651(a)(1) addition to tax.

Respondent further determined that petitioner is liable for a section 6654(a) addition to tax for failure to pay estimated tax. Respondent has met his burden of establishing that petitioner was required to make an annual payment. See secs. 6654(d)(1)(B), 7491(c); Wheeler v. Commissioner, 127 T.C. 200, 211 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008). On the SFR, which was prepared in conformity with the requirements of section 6020(b), respondent calculated and reported a tax liability of $225,284. See Mendes v. Commissioner, 121 T.C. 308, 327-328 (2003) (holding that a tax return filed after a notice of deficiency is issued is not considered a filed return for purposes of section 6654(d)(1)(B)(i)). In the preceding year, petitioner had adjusted gross income of $271,028 and a tax liability of $58,493.

Petitioner's required annual payment was $64,342 (i.e., 110% of $58,493), yet he made estimated tax payments of $29,761 relating to 2007 and does not meet the requirements of any exceptions to section 6654. <u>See</u> sec. 6654(d)(1)(B)(i) and (ii), (C)(i), (e). Accordingly, we sustain respondent's determination.

Contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.